*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
DALY, GROSS, and de GROOT
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**JOHN A. AGUILAR**
Sergeant (E-5),
U.S. Marine Corps
*Appellant*

**No. 202300092**

_____

Decided: 30 September 2024

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judges:
Michael D. Zimmerman (arraignment, motions and trial)
John L. Ferriter (motions)
Angela J. Tang (motions)
John J. Stephens (post-trial motions and entry of judgment)

Sentence adjudged 16 August 2022 by a general court-martial tried at Marine Corps Base Quantico, Virginia, consisting of members with enlisted representation. Sentence in the Entry of Judgment: confinement for 12 months, forfeiture of all pay and allowances, reduction to E-1, and a bad-conduct discharge.

*1 October 2024: administrative correction to reflect correct NMCCA number*

For Appellant:
*Lieutenant Commander Christopher McMahon, JAGC, USN (argued)*
*Lieutenant Colonel Matthew Neely, USMC (on brief)*

For Appellee:
*Major Mary-Claire Finnen, USMC (argued)*
*Lieutenant Colonel James Burkhart, USMC (on brief)*

Judge GROSS delivered the opinion of the Court, in which Senior Judge DALY and Judge de GROOT joined.

———————————————

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Appellate Procedure 30.2.**

———————————————

GROSS, Judge:

A general court-martial, composed of members with enlisted representation, convicted Appellant, contrary to his pleas, of two specifications of false official statement, one specification of assault with an unloaded firearm, and one specification of extramarital sexual conduct, in violation of Articles 107, 128, and 134, Uniform Code of Military Justice (UCMJ).[1]

Before us, Appellant raises five assignments of error (AOEs) which we reorder and rephrase as follows: (1) Did the military judge err in reconsidering his ruling to dismiss an offense pursuant to Rule for Courts-Martial (R.C.M.) 707; (2) is the evidence legally and factually sufficient to support Appellant's convictions for extramarital sexual conduct and assault; (3) did the Government violate R.C.M. 914 by failing to disclose a witness's prior statements despite the Defense's timely request for them; (4) did the Government violate its discovery obligations by failing to disclose material evidence to the Defense before trial; and (5) were trial defense counsel ineffective in failing to interview the Government investigator before he testified on the merits.

We find merit in Appellant's claim that the evidence is factually insufficient to support his conviction for extramarital sexual conduct and will take action

---

[1] 10 U.S.C. §§ 907, 928, 934.

in our decretal paragraph. Having considered Appellant's remaining assignments of error, the arguments of counsel, and the record as a whole, and after reassessing Appellant's sentence, we find no merit in his other AOEs.

## I. BACKGROUND

Appellant married Ms. C.A.[2] in 2013 and the couple had a child together. The marriage was tumultuous nearly from the start with allegations of domestic violence and infidelity, and, in 2018, Ms. C.A. moved with their minor son to San Antonio, Texas. In 2019, Ms. C.A. traveled back to Virginia and discovered that Appellant had moved in with Ms. R.L. and was in a relationship with her. Ms. C.A. reported this relationship along with Appellant's domestic abuse of Ms. C.A. to the base Inspector General and Appellant's command. The command opened an investigation into the alleged adulterous relationship and referred the allegations of domestic violence to the Naval Criminal Investigative Service.

Captain Mike[3] was appointed by Appellant's command to investigate Ms. C.A.'s complaint of extramarital sexual conduct. Captain Mike interviewed Appellant on 9 and 10 July 2019. During both interviews, after being advised of his rights under Article 31(b), UCMJ, Appellant falsely told Captain Mike that Ms. R.L. was not living with him and that he was not in a sexual relationship with her.

Following both investigations, the Government charged Appellant with three specifications of violation of Article 128, UCMJ, for assaulting Ms. C.A. and three specifications of violation of Article 107, UCMJ, for providing false official statements to Captain Mike. Appellant requested a 20-day continuance of the Article 32 preliminary hearing, then ultimately waived his right to the hearing. The charges were referred to a general court-martial and Appellant was arraigned.

After this arraignment, investigators learned that Ms. R.L. also reported that Appellant had subjected her to multiple instances of domestic violence. In addition, Ms. R.L. told investigators of an incident in North Carolina in which Appellant pointed a handgun at a civilian following a verbal altercation. As a result of these additional allegations, on 30 November 2020 the convening authority (CA) withdrew, but initially did not dismiss, the original charges and

---

[2] All victims in this opinion will be referred to by initials only, and all persons other than Appellant, counsel, and the judges will be referred to by pseudonym.

[3] Captain Mike promoted to Major by the time of trial, but will be referred to by the rank he held at the time of Appellant's statements.

specifications. Ultimately, the CA dismissed the withdrawn original charges and specifications on 21 January 2021. The Government then preferred the four specifications of assault and aggravated assault upon Ms. C.A. and two specifications of false official statement addressed by the original charges along with three new specifications of assault and aggravated assault upon Ms. R.L., one specification of aggravated assault with a loaded firearm upon Ms. C.T., one specification of assault with an unloaded firearm upon Ms. C.T., and one specification of extramarital sexual conduct in violation of Articles 128 and 134, UCMJ.

Appellant was arraigned on these new charges on 22 July 2021 and subsequently filed a motion to dismiss the original charges and specifications (relating to the assaults upon Ms. C.A. and the false official statements) for violation of his regulatory speedy trial rights under R.C.M. 707. On 20 September 2021, the military judge held an Article 39(a) session.

As the hearing was concluding, the military judge indicated to trial counsel that he did not believe that the evidence produced to that point showed that the Government had complied with R.C.M. 707. He then offered trial counsel the opportunity to supplement the filing with additional evidence, saying, "we're talking about dismissal and that's going to be done very deliberately and not without me understanding all the facts. . . [ trial counsel are] limping along and I'm going to give them chances to [marshal their evidence] before I make a final decision, because I want to make sure I know all the facts."[4]

The Government continued to limp along in the speedy trial litigation later that day, having presented some evidence that the Defense had requested a 20-day delay in the original Article 32 preliminary hearing. This delay, if approved as excludable delay, would have placed the R.C.M. 707 clock at 110 days rather than the 130 days that the Defense claimed had elapsed from the original preferral to the CA's dismissal. Once again, however, the Government failed to meet its burden, as it presented only evidence that the delay had been requested, not that it had been approved or classified as excludable. The military judge, apparently believing he had heard all of the extant relevant evidence, expressed his intent to the parties, saying, in relevant part,

> I'm going to do a written ruling of course. I mean, I have to. And with an issue of – of this import, even if I didn't have to, I – I would. I think it's – it's called for. I'd hope to have it out tomorrow, but I will tell you orally on the record that I'm going to find that...R.C.M. 707 was violated...So those Charges, when I get my

---

[4] R. at 43.

written ruling together, are going to be dismissed without prejudice...I will write that up, but you have my ruling now so you can take whatever action you want to take. If there's any conflict between my written ruling and what I just said, my written ruling will control.[5]

The military judge then turned to another pending evidentiary motion and opined, "[w]ith that being the case, I do think that this moots this – the next motion because the affected evidence is...for charges that are not before this court. So I'm going to dismiss that motion and the response...as moot."[6]

The following day, trial counsel emailed the military judge, having finally marshalled the evidence the military judge had found lacking. This came in the form of an affidavit of the preliminary hearing officer (PHO) attesting that when the Defense had requested a 20-day continuance of the preliminary hearing, he had granted it along with the Government's request that the 20 days be excludable.

Upon receipt of the Government's filing, the military judge wrote the parties saying,

> I think how we proceed depends on exactly what I said yesterday. If I said I planned to or intended to dismiss the charges then you may file this evidence on a pleading to court stating that fact and identifying the time in the record when I said what I said. If instead I said the charges were dismissed, with my written ruling merely laying out the details, then you need to file this evidence as part of a motion to reconsider...I do not consider this matter properly before the court at this time until one of the two above actions are taken.[7]

Later the same day, the military judge informed the parties that he had listened to the audio recording of the previous day's session and indicated he did not believe his ruling was final. In doing so, he relied on his statement that "when I get my ruling together [the Charges] are going to be dismissed" to find he had not conclusively ruled.[8]

---

[5] R. at 58-59.

[6] R. at 59.

[7] Appellate Ex. XI at 7.

[8] *Id* at 6.

The court was called to order again the following week. Trial defense counsel objected to the military judge's consideration of the Government's new evidence, claiming that the military judge's previous statements had dismissed the affected Charges and that the military judge lacked jurisdiction to consider the matter.

The military judge considered the arguments of the parties and determined that "there was at least enough ambiguity to say that I hadn't finally ruled on the matter. And even if I had, certainly the Court *sua sponte* can reconsider and the parties can move [for] reconsideration."[9] He then received the evidence over the Defense's objection and ruled that the Government had finally carried its burden to show that Appellant's speedy trial rights under R.C.M. 707 were not violated.

Following his ruling on the Defense's speedy trial motion, the case continued through pretrial litigation. The military judge severed the offenses into two trials: one for the offenses relating to Ms. R.L. and C.T. and another for the offenses relating to Ms. C.A. This appeal addresses the issues in the first trial.[10]

Appellant was then tried for the offenses against Ms. R.L., the assault with a firearm upon Ms. C.T., the false official statements to Captain Mike, and extramarital sexual conduct. The members acquitted Appellant of all of the alleged domestic violence against R.L. and alleged aggravated assault with a loaded firearm of Ms. C.T., but convicted him of assault with an unloaded firearm of Ms. C.T., the false official statements, and the extramarital sexual conduct.

Additional facts necessary to resolve Appellants' AOEs are discussed below.

---

[9] R. at 63.

[10] The issues raised in the second trial will be considered in a separate opinion.

## II. DISCUSSION

**A. The military judge did not err in considering additional evidence regarding Appellant's speedy trial motion and reconsidering his ruling.**

*1. Standard of Review and Law*

Whether a court-martial has jurisdiction over an offense is a matter that we review *de novo*.[11] A motion to dismiss for violation of an accused's speedy trial rights under R.C.M. 707 is made pursuant to R.C.M. 907, which states that "[a] motion to dismiss is a request to terminate further proceedings as to one or more charges and specifications on grounds capable of resolution without trial of the general issue of guilt."[12] A military judge is charged with "[ruling] on all interlocutory questions and all questions of law raised during the court-martial..."[13]

In determining whether a military judge has issued a ruling on a matter before him, this Court previously stated, "we must give weight to the local practice and to the intentions of the military judge as manifested by his action on the record of the particular case."[14] In *United States v. Flores-Galaraza*, this Court's predecessor considered the record as a whole in determining whether the military judge's statements regarding a motion to suppress evidence was final when announced by the military judge on the record.[15] The Court looked at the fact that the military judge articulated the rationale for his ruling, and that the military judge and trial counsel had discussed the probability of a government appeal in determining what the military judge's intent was at the time of his pronouncement.[16]

While R.C.M. 801 states that a military judge's rulings on questions of law are final, it also says, "[t]he military judge may change a ruling made by that or another military judge in the case except a previously granted motion for a

---

[11] *United States v. Davis*, 63 M.J. 171, 173 (C.A.A.F. 2006) (citations omitted).

[12] R.C.M. 907(a).

[13] R.C.M. 801(a)(4).

[14] *United States v. Flores-Galarza*, 40 M.J. 900, 906 (N-M.C.M.R. 1994) (citations omitted).

[15] *Flores-Galarza*, 40 M.J. at 906-907.

[16] *Id.*

finding of not guilty, *at any time during the trial.*"[17] Rule for Courts-Martial 905 sets forth the procedures for motions generally, and states that "[o]n request of any party or *sua sponte*, the military judge may, prior to entry of judgment, reconsider any ruling, other than one amounting to a finding of not guilty, made by the military judge."[18]

In a similar vein, the non-binding discussion to R.C.M. 907 states, "[d]ismissal of a specification terminates the proceedings with respect to that specification unless the decision to dismiss is reconsidered and reversed by the military judge."[19]

In light of the rules set forth above, case law has consistently held that a military judge retains authority to reconsider a ruling to dismiss. In *United States v. Floyd*, we said:

> We employ ordinary rules of statutory construction to interpret the Rules for Courts-Martial, to include reading them holistically. We find that the military judge may reconsider a ruling or order, including supplementing an oral ruling with written findings, after notice of an appeal under Article 62, UCMJ, and prior to the authentication of the record.[20]

In so finding, we noted the Air Force Court of Criminal Appeals' recognition that "[t]he Supreme Court has noted the wisdom of allowing trial courts 'the opportunity to promptly correct their own alleged errors,' as opposed to imposing added and unnecessary burdens on appellate courts."[21]

Similarly, the Army Court of Criminal Appeals recognized the authority of a military judge to reconsider and subsequently deny an accused's speedy trial motion after initially granting it.[22] In *United States v. Hill,* the military judge initially granted a motion to dismiss under R.C.M. 707 but, after realizing that she had applied the incorrect standard, later denied it. After a tortured procedural history, the Army Court found that the military judge had "authority to

---

[17] R.C.M. 801(e)(1)(B) (emphasis added).

[18] R.C.M. 905(f).

[19] R.C.M. 907(a) (Discussion).

[20] *United States v. Floyd*, 82 M.J. 821, 827 (N-M. Ct. Crim. App. 2022).

[21] *Id*. at 828 (quoting *United States v. Catano*, 75 M.J. 513, 515 (A.F. Ct. Crim. App. 2015)).

[22] *United States v. Hill*, 71 M.J. 678 (Army Ct. Crim. App. 2012).

act on the case and was within her discretion pursuant to R.C.M. 905(f) to reconsider and reverse her earlier ruling."[23]

Finally, the Court of Appeals for the Armed Forces (CAAF) has recognized the authority of a military judge to reconsider a motion granting an accused's motion to dismiss under R.C.M. 707, albeit indirectly, in *United States v. Daly*.[24] In that case, the CAAF dismissed a Government appeal under Article 62 for failing to meet the jurisdictional timeline for filing such an appeal, saying, "The Government failed to file either a motion for reconsideration of the order to dismiss or a notice of appeal within the seventy-two-hour period for government appeals authorized in Article 62(a)(2)."[25]

*2. Analysis*

a. The military judge's ruling on 20 September was a final ruling.

As an initial matter, we must determine whether the military judge's pronouncement on the record on 20 September was a final ruling, or whether he had left the matter open for further consideration. While the military judge opined that his pronouncements on the record did not meet the definition of a final ruling under R.C.M. 801, we are not convinced. What is clear from the context of the proceedings is that the Defense brought a motion to dismiss, and the Government initially operated under a legal theory (that the initial withdrawal and subsequent dismissal by the CA stopped the R.C.M. 707 clock) that the military judge did not find convincing.

After the military judge informed the parties of this, the Government then sought to prove that it had not in fact violated R.C.M. 707. Following the first Article 39(a) session on 20 September, the military judge permitted the Government to supplement the record to show that there was a grant of excludable delay for 20 days. The Government later that same day then submitted evidence of a Defense delay request, a Government endorsement and request for excludable delay, but no evidence that the PHO had actually granted the Government's request for excludable delay. The court then re-convened and the military judge informed the parties of his analysis and advised them that he

---

[23] *Id.* at 684.

[24] 69 M.J. 485 (C.A.A.F. 2011).

[25] *Id.* at 486.

was going to reduce his ruling to writing but indicated that "you have my ruling now."[26]

After the military judge's pronouncement and declaration that the other motion was moot, no party discussed the court receiving additional evidence on the matter. We find that, based upon the context of the litigation and everything that had happened up to the military judge's announcement, his words constituted a ruling that was a final ruling for purposes of R.C.M. 801. As a result, had the Government decided to file an interlocutory appeal under Article 62, UCMJ, its time to do so would have started then.[27] However, that is not the tack that the Government set. Rather, the Government sought to carry its burden at the trial level and asked permission to supplement the record, which the military judge allowed. As a result, we must confront Appellant's claim—first made at trial and raised again on appeal, that the military judge lacked the authority to consider additional evidence and reconsider his ruling.

b. The military judge had authority to reconsider his ruling and take further evidence.

At trial, after the Government sought to supplement its filing on September 21, trial defense counsel filed an addendum to the motion arguing that the Government was required to file a motion for reconsideration, but that they were precluded from doing so under the local rules of court. On appeal, Appellant initially claimed that "[b]ecause the [m]ilitary [j]udge dismissed Charge II, the court-martial lost jurisdiction over it."[28] In his reply, Appellant's position changed slightly to claim that the error below was that the military judge lacked authority to hold the subsequent Article 39(a) session on 30 September to take additional evidence, and said that "this Court need not resolve [the question of whether a military judge may reconsider a ruling without holding another hearing under Article 39(a)]" but "maintain[ed] that the Military Judge lost jurisdiction over Charge II...once he dismissed [it]."[29]

Appellant's position changed once more at oral argument, with appellate defense counsel stating, "we concede that [the military judge] can reconsider"[30]

---

[26] R. at 59.

[27] *See Flores-Galaraza*, 40 M.J. at 906; *See also Daly*, 69 M.J. at 485.

[28] Appellant's Brief at 25.

[29] Reply Brief at 2.

[30] Oral Argument at 7:09-7:11.

but claimed that the military judge could not hold further proceedings regarding the affected Charges and Specifications. Regardless of the basis for Appellant's AOE, however, we are convinced that it does not have merit.

First, the Manual for Courts-Martial (MCM) is uniform in addressing the authority of a military judge to reconsider prior rulings. As noted above, Rules 801, 905, and the discussion to Rule 907 are all in agreement that a military judge may reconsider any ruling other than a ruling that amounts to a finding of not guilty. And precedent from this Court, other service courts, and the CAAF confirm that a military judge has the authority to reconsider a ruling just like the one at issue here.

Appellant cites no authority for his argument that the military judge was prohibited from holding further proceedings, and indeed we find authority to the contrary in the rules, case law, and the President's authority under Article 36, UCMJ. While Appellant is correct that a motion to dismiss is a request to terminate the proceedings, nothing in R.C.M. 907 indicates that a granted motion removes a military judge's authority to reconsider such a motion or consider the matter further. Rather, the authoritative rule on termination of proceedings is found in R.C.M. 1111. Rule 1111 states that it is the entry of judgment (EOJ) that "terminates the trial proceedings." As such, a military judge retains the responsibility and authority to "exercise reasonable control over the proceedings" until the EOJ is signed.[31] This includes the authority to reconsider even final rulings that "terminate the proceedings" under Rules 801 and 905.

This authority squares with a federal judge's ability to reconsider rulings to give "district courts the opportunity promptly to correct their own alleged errors…."[32] And indeed, the President's issuance of R.C.M. 801 and 905 clearly comport with his duty under Article 36 to make rules that "apply the principles of law and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts."[33] We therefore hold that a military judge may reconsider a ruling granting a motion to dismiss and may take additional evidence and hold additional proceedings in doing so. As a result, Appellant's first AOE fails.

---

[31] R.C.M. 801.

[32] *United States v. Dieter*, 429 U.S. 6, 8 (1976).

[33] 10 U.S.C. § 836.

**B. Legal and Factual Sufficiency**

*1. Law*

To determine legal sufficiency, we ask whether, "considering the evidence in the light most favorable to the prosecution, a reasonable fact-finder could have found all the essential elements beyond a reasonable doubt."[34] In conducting this analysis, "all of the evidence is to be considered in the light most favorable to the prosecution."[35]

For convictions of crimes that occurred prior to 2021, we review factual sufficiency de novo.[36] The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses," we are convinced of an appellant's guilt beyond a reasonable doubt.[37] Review of the factual sufficiency of the evidence is a special power and duty that Article 66(d)(1), UCMJ, confers only on the Courts of Criminal Appeals (CCA).[38] This "awesome, plenary, de novo power" requires us to weigh all the admitted evidence and testimony at trial, make "'allowances for not having personally observed the witnesses,' and decide whether we are convinced of the Appellant's guilt beyond a reasonable doubt."[39]

We presume neither innocence nor guilt, and instead take "a fresh, impartial look at the evidence" to independently determine whether each element

---

[34] *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citing *Jackson v. Virginia,* 443 U.S. 307, 319 (1979)).

[35] *Jackson*, 443 U.S. at 319 (citations omitted).

[36] Article 66(d)(1), UCMJ, 10 U.S.C. § 866(d)(1) (2019); *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017).

[37] *Turner*, 25 M.J. at 325; *see also* Article 66(d)(1), UCMJ, 10 U.S.C. § 866(d)(1) (2017) ("In considering the record, the Court may weigh the evidence, judge the credibility of witnesses, and determine controverted questions of fact, recognizing that the trial court saw and heard the witnesses.").

[38] *United States v. Thompson*, 83 M.J. 1, 3 (C.A.A.F. 2022).

[39] *United States v. Armendariz*, 82 M.J. 712, 722 (N-M. Ct. Crim. App. 2022) (citation omitted).

has been satisfied with proof beyond a reasonable doubt.[40] Proof beyond a reasonable doubt "does not mean the evidence must be free from conflict,"[41] but guilt must be proved beyond a reasonable doubt. If the evidence admitted at trial leaves us with a "'fair and reasonable hypothesis except that of guilt,' we are required to set aside the conviction."[42]

*2. Analysis*

a. Appellant's conviction for assault with an unloaded firearm is legally and factually sufficient

At trial, three people testified to having witnessed Appellant point a firearm at Ms. C.T. as charged. Ms. C.T. testified that while she was driving in Newport, NC, she came upon a car that was stopped in the roadway and partially blocking traffic at an intersection. As she slowly passed the other car, the female driver made an obscene gesture at her, and Ms. C.T. asked the woman if she knew she was blocking the road. Appellant then appeared, leading a dog by the collar, and began screaming obscenities at her. Appellant placed the dog into the car that was blocking the roadway, reached into the passenger side door, pulled out a handgun, and pointed it at her. Appellant then racked the slide of the pistol, walked toward her vehicle while still shouting and cursing at her, and continued to point the pistol at her.

Ms. C.T. testified that she never threatened Appellant, did not point a weapon at Appellant, did not have a weapon, and never got out of her car. She testified that after Appellant's car left, she proceeded to call 911. She testified that when she called 911 she was afraid, and specifically afraid that Appellant would return and actually shoot her.

Ms. R.L. testified that she was the driver of the car that Appellant was in that morning. Much of her testimony matched Ms. C.T.'s, including testifying that Appellant pointed a handgun at Ms. C.T. However, Ms. R.L. testified that Ms. C.T. made the obscene gesture and that Ms. C.T. got out of her car and approached them.

Also present at the intersection that day was another civilian, Ms. Charlie, who witnessed the interaction of Appellant and Ms. C.T. According to Ms. Charlie, she saw Appellant yelling and screaming at Ms. C.T. Ms. Charlie saw

---

[40] *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

[41] *United States v. Rankin*, 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006) (citation omitted).

[42] *Armendariz*, 82 M.J. at 722 (citation omitted).

Appellant retrieve a pistol from the passenger side of his car and point it at Ms. C.T. Ms. Charlie testified that she, too, saw Appellant manipulate the slide of the pistol as he pointed the firearm at Ms. C.T, that Ms. C.T. never got out of her car, and that she never saw Ms. C.T. holding anything that resembled a weapon. Ms. Charlie testified that while she could see Ms. C.T. clearly in the car, she did not know Ms. C.T. and had never seen her before that day.

Finally, the Government called Officer Alpha, a police officer who was on patrol in Newport, NC, on the morning of 20 May 2019. Officer Alpha testified that he received a call from Ms. C.T. and that during the call she was hysterical and said that she feared for her life during the incident. Officer Alpha also told the panel that both Appellant and Ms. R.L. denied that Appellant pointed a firearm at Ms. C.T., but that Appellant later admitted to overreacting.

To prove Appellant's guilt with respect to assaulting Ms. C.T. with an unloaded firearm the Government was required to prove: (1) that Appellant attempted or offered to do bodily harm to C.T.; (2) that the attempt or offer was done unlawfully; and (3) that the attempt was done with force or violence.[43] For an offer type assault, which this was, the Government was required to prove that Appellant's unlawful demonstration of violence created in the mind of C.T. a reasonable apprehension of receiving immediate bodily harm.[44]

Appellant levels two primary attacks on the Government's proof at trial, arguing that the Government did not disprove that Appellant was acting lawfully in self-defense and that Ms. C.T. did not have a reasonable apprehension of receiving immediate bodily harm. We disagree.

With respect to Appellant's claim of self-defense, we find that the Government presented more than ample evidence that disproved the affirmative defense. While Ms. R.L. testified that Ms. C.T. got out of her vehicle, neither Ms. C.T. nor, crucially, Ms. Charlie, testified to that. Rather, both were consistent that Appellant was acting aggressively for no apparent reason, screaming obscenities and pointing a firearm in what was otherwise a relatively common interaction.

The panel was instructed on both self-defense and defense of another and determined that neither defense applied. We agree. The law of self-defense allows a person to lawfully defend against a simple assault allegation when he (1) reasonably apprehends bodily harm was about to be inflicted on himself

---

[43] *Manual for Courts-Martial, United States,* pt. IV, para. 77.b.(1) (2019 ed.) (*MCM*). *See also United States v. Cole,* 84 M.J. 398, 401 (C.A.A.F. 2024).

[44] *MCM* pt. IV, para. 77.c.(2)(b)(ii).

and (2) believes that the force used was necessary for protection against bodily harm, provided that the force used by the accused was less than force reasonably likely to produce death or grievous bodily harm.[45] An individual may also, "for the purpose of frightening an assailant … threaten to resort to more force than [one] may permissibly, under the law, actually employ in self-defense."[46]

The standard for self-defense therefore contains within it both subjective and objective requirements.[47] If the use of force or display of force is objectively unreasonable, the defense of self-defense does not apply.[48]

In this case, the evidence shows that Appellant's actions were unprovoked and unreasonable. Having just placed a wayward dog in the backseat of his car, Appellant confronted and pointed a firearm at a civilian mother of two who had the temerity to point out that Appellant's girlfriend was blocking a public thoroughfare with her car. There is simply no credible evidence that Ms. C.T. presented a threat to either Appellant or Ms. R.L. While Appellant highlights that Ms. R.L. testified that Ms. C.T. left her car and approached Appellant, this testimony was at odds with that of Ms. C.T. and Ms. Charlie. We find that Ms. R.L.'s testimony on this point was not credible and that the evidence showed beyond a reasonable doubt that no reasonable person would have apprehended a threat from Ms. C.T.

Similarly, we reject Appellant's claim that the evidence is legally and factually insufficient because Ms. C.T. did not have a reasonable apprehension of receiving immediate bodily harm. Appellant likens this case to that of *United States v. Tran*,[49] where we set aside a guilty plea because the victim testified that he was not afraid, but rather angry when the appellant pointed a firearm

---

[45] R.C.M. 916(e).

[46] *United States v. Acosta-Vargas*, 32 C.M.R. 388, 393 (U.S. C.M.A. 1962) (citations omitted).

[47] *United States v. Dobson*, 63 M.J. 1, 11 (C.A.A.F. 2006) ("The first element, under subparagraph (A), has an objective component, involving the perception of a reasonable person under the circumstances. The second element, under subparagraph (B), is wholly subjective, involving the personal belief of the accused, even if not objectively reasonable.")

[48] *See United States v. Waldron*, 9 M.J. 811, 820 (N-M.C.M.R. 1980) (Donovan, J., concurring) ("Insofar as it relates to reasonableness, the test is whether, considering all the circumstances, a reasonable, prudent person would believe that there was ground to apprehend [bodily harm]").

[49] NMCCA 200600880, 2007 CCA LEXIS 112 (N-M. Ct. Crim. App. Mar 28, 2007) (unpublished).

at him. While Appellant points to an exchange between trial defense counsel and Ms. C.T. on cross-examination where she testified that she did not believe Appellant intended to hurt her to show that she was not scared, the evidence is clear that whatever she believed Appellant's intent to be when he pointed the weapon at her (which was pure speculation, but asked without objection), the result of Appellant's action was that she feared being shot.

The record contains ample evidence of Ms. C.T.'s fear at the time of the assault. She testified that after Appellant left, she was afraid that he would return and fire the gun at her. Officer Alpha testified that Ms. C.T. was hysterical on the phone in the aftermath of the assault – a reasonable response to being threatened and afraid. We therefore find this case distinguishable from *Tran.*[50] We find that the evidence is more than sufficient to prove beyond a reasonable doubt that Appellant committed an offer type assault with an unloaded firearm.

> b. The evidence is legally sufficient but factually insufficient to sustain Appellant's conviction for extramarital sexual conduct.

To prove Appellant's guilt to the Specification of Charge III, extramarital sexual conduct, the Government was required to show that: (1) Appellant engaged in extramarital sexual conduct (defined as including, inter alia, genital to genital sexual intercourse); (2) that at the time Appellant knew that he or the other person was married to another person; and (3) that under the circumstances, the conduct was of a nature to bring discredit upon the armed forces.[51]

For most offenses that are of a nature to bring discredit upon the armed forces charged under clause 2 of Article 134, UCMJ, the Government is required to prove that the conduct "has a tendency to bring the service into disrepute or which tends to lower it in public esteem."[52] However, for offenses of extramarital sexual conduct, the term "discredit" is further defined as "to injure the reputation of the armed forces, and includes extramarital conduct that has a tendency, *because of its open or notorious nature*, to bring the Service into disrepute, make it subject to public ridicule, or lower it in public esteem."[53] Our

---

[50] *Id.*

[51] *MCM* pt. IV, para. 99.b.

[52] *MCM* pt. IV, para. 91.c.3.

[53] *MCM* pt. IV, para. 99.c (emphasis added).

Superior Court recently reiterated that it is the nature of the extramarital sexual conduct in question, and not whether someone actually learned it that determines whether the Government has met its burden to prove a violation of Article 134 legally sufficient under clause 2.[54]

The explanation then goes on to list nine non-exhaustive factors for commanders to consider in determining whether the conduct is of a nature to bring discredit upon the armed services, including: the rank of the accused, whether notoriety ensued, the existence of other violations of the UCMJ during the extramarital relationship, and whether the marriage was pending legal dissolution. This addition to the offense of extramarital sexual conduct (previously only chargeable as adultery) was a result of a change to the *MCM* in 2002.

At trial, Ms. R.L. testified that she entered into a romantic relationship with Appellant beginning in about October 2018. She testified that she and her minor daughter moved in with Appellant in the summer of 2018 while Appellant was living with her cousin. Ms. R.L. testified that she knew that Appellant was married but believed him to be going through a divorce when she began a romantic and sexual relationship with him.

Ms. R.L.'s understanding was supported by the divorce decree between Appellant and Ms. C.A.[55] The divorce decree stated that "The parties have lived separate and apart...since May 29, 2018 to the present, and the parties intended during that time to remain separate and apart permanently and no reconciliation is probable."[56]

In contrast to this written finding of the family court judge, Ms. C.A. testified that she had only temporarily moved to Texas. The following exchange between trial counsel and Ms. C.A. occurred:

> Q: Were you still trying to work things out in your marriage while you were living in Texas physically away from him?
>
> A: Yes, we both agreed that I was going to move to Texas to help pay the bills here...
>
> Q: How did you first hear about Sergeant Aguilar having a sexual relationship with someone besides you?

---

[54] *United States v. Wells*, __ M.J. __, No. 23-0219, 2024 CAAF LEXIS 552, 5-6* (C.A.A.F. Sep. 24, 2024).

[55] Pros. Ex. 19.

[56] Pros. Ex. 19 at 2.

> A:    When I came down to Virginia to see him for working on our
>        marriage.[57]

Ms. C.A. was not asked about the direct contradiction between the divorce decree and her sworn testimony. On cross-examination, Ms. C.A. admitted that Appellant had sent her separation paperwork, but then claimed that he told her not to sign the papers.

The standard for legal sufficiency is a low one and requires only that we determine whether, considering the evidence in the light most favorable to the prosecution, a reasonable fact-finder could have found all the essential elements beyond a reasonable doubt. The parties do not dispute that Appellant and Ms. R.L. had sexual intercourse or that at the time that Appellant was still married to Ms. C.A. The only dispute is whether the Government proved that the sexual conduct was service discrediting. Here, given the following factors: (1) the fact that Appellant and Ms. R.L. lived together (apparently openly enough for Ms. C.A. to discover the relationship); (2) Appellant's rank as an NCO; (3) the lack of a formal separation agreement between Appellant and Ms. C.A.; and (4) the involvement of police in Appellant's tumultuous relationship with Ms. R.L., we find that the Government has met its burden to prove legal sufficiency.

However, when it comes to factual sufficiency we must ask ourselves whether we, having taken a fresh and impartial review of the evidence are ourselves convinced of Appellant's guilt beyond a reasonable doubt. We are not. There remains in the record an unresolved dichotomy between Ms. C.A.'s testimony that the couple was "working"[58] on their marriage and the findings of a family court judge that the "parties intended to remain separate and apart permanently."[59]

Because this contradiction was never resolved, we are left only with questions as to the actual state of the marriage between Appellant and Ms. C.A., and those questions raise serious doubts as to whether Appellant's status as a married Marine and his corresponding relationship with Ms. R.L. was of a nature to bring discredit upon the armed forces. Not every marriage is the same,

---

[57] R. at 847-48.

[58] R. at 847.

[59] Pros. Ex. 19 at 2.

and the *MCM* does not require celibacy until dissolution in all cases.[60] This is true especially where there is evidence that the marriage has broken down and is irretrievable prior to the extramarital relations. Since we are not ourselves convinced beyond a reasonable doubt of Appellant's guilt as to the terminal element of this offense, we are obligated to use our "awesome, plenary, de novo power" and dismiss Charge III and its Specification.[61]

## C. The Government's failure to turn over notes of Gunnery Sergeant Hotel did not prejudice Appellant.[62]

*1. Analysis*

Appellant's third and fourth AOEs allege that the Government failed in its discovery obligation when it did not turn over notes of Gunnery Sergeant (GySgt) Hotel under both R.C.M. 701 and 914. During the discovery phase of the trial, Appellant made a discovery request for, among other things, "[d]isclosure of the entire investigative file … [including] all case notes, case agent summaries, interview notes and summaries."[63]

At trial, the Government called their Regional Trial Investigator (RTI), GySgt Hotel.[64] Gunnery Sergeant Hotel testified to a number of topics during his examination, including, most crucially: (1) his efforts to find Mr. Echo (a witness to the alleged assaults on Ms. R.L.); (2) Appellant's ownership and the

---

[60] *Wells,* __ M.J. ___, slip op. at 14 (Hardy, J., dissenting) ("Common sense dictates that the military does not consider every act of extramarital sexual conduct by servicemembers to violate Clause 2 of Article 134, UCMJ...").

[61] *United States v. Kelly*, 77 M.J. 404, 406 (C.A.A.F. 2018) (quoting *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990)).

[62] Because we find that Appellant's conviction for extramarital sexual conduct is factually insufficient, we need not address Appellant's claims that the Government failed to turn over evidence that could have been used to impeach C.A.'s claims that the couple was working on their marriage. At oral argument, Appellant conceded that those alleged discovery errors only impacted Charge III.

[63] Appellate Ex. LXXXIII at 27.

[64] An RTI is an enlisted Marine with the Criminal Investigative Division (CID) who is assigned to the Regional Trial Office (RTO) and performs investigative duties as well as serves as the evidence custodian for the RTO. Although the parties referred to GySgt Hotel as "Agent Hotel" due to his status as a sworn law enforcement officer for CID, we note that the record is clear that at all times during this trial, GySgt Hotel held the enlisted rank of E-7 and we will therefore refer to him by his military rank for clarity and consistency.

chain of custody of a SIG Saur P320 pistol; and (3) the operation of a SIG Sauer P320 pistol.

Prior to trial, GySgt Hotel also interviewed Mr. November,[65] and Sgt Golf. Mr. November told GySgt Hotel that he spoke with one of Appellant's neighbors regarding one of Appellant's alleged assaults and that the neighbor had opined that the allegation was "bulls***."[66] This interview was not disclosed to the Defense until after trial.

Sgt Golf told GySgt Hotel that he had attempted to purchase Appellant's P320 but was unable to do so because it was being held for the investigation into Appellant's alleged assaults. Sgt Golf also told GySgt Hotel that he knew that Appellant owned a shotgun and a separate "1911...carry pistol."[67] Sgt Golf's statements regarding the attempted purchase of the P320 were disclosed to the Defense, but his statements regarding Appellant's ownership of other firearms were not provided to the Defense until after trial.

Rule for Courts-Martial 914 states, in relevant part, that

> after a witness...has testified on direct examination, the military judge, on motion of a party who did not call the witness, shall order the party who called the witness to produce...any statement of the witness that relates to the subject matter concerning which the witness has testified.

Generally a R.C.M. 914 violation will not rise to a constitutional error.[68] The *Kohlbek* framework is the appropriate prejudice analysis for preserved nonconstitutional R.C.M. 914 error.[69]

> For nonconstitutional evidentiary errors, the test for prejudice is whether the error had a substantial influence on the findings. In conducting the prejudice analysis, this Court weighs: (1) the

---

[65] A former Marine then serving as Appellant's officer-in-charge.

[66] Appellate Ex. LXXXII at 42.

[67] Appellate Ex. LXXXII at 38.

[68] *United States v. Sigrah*, 82 M.J. 463, 467 (C.A.A.F. 2022).

[69] *Id*. at 468.

strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question.[70]

Alternatively, failure of the Government to turn over evidence that is favorable to the Defense is a discovery violation, and the CAAF has said, "[o]ur review of discovery/disclosure issues utilizes a two-step analysis: first, we determine whether the information or evidence at issue was subject to disclosure or discovery; second, if there was nondisclosure of such information, we test the effect of that nondisclosure on the appellant's trial."[71] The CAAF defines

> two categories of disclosure error: (1) cases in which the defense either did not make a discovery request or made only a general request for discovery; and (2) cases in which the defense made a specific request for the undisclosed information. For cases in the first category, we apply the harmless error standard. For cases in the second category, we apply the heightened constitutional harmless beyond a reasonable doubt standard.[72]

Failing to disclose requested material favorable to the Defense is not harmless beyond a reasonable doubt if the undisclosed evidence might have affected the outcome of the trial.[73]

### 2. Analysis

We start by noting that we are disturbed by the Government's haphazard and cavalier approach to discovery in this case. This is of particular concern in a case where, as here, the investigator: (1) worked for the trial counsel; (2) interviewed a witness regarding that witness's attempt to purchase the firearm that the Government contended was the same firearm used in an assault; and (3) then drafted up incomplete documentation of that interview which did not contain information regarding other firearms the witness identified as being owned by Appellant. Whether viewed under the framework of R.C.M. 914 or 701, we will assume that the Government's failure to turn over GySgt Hotel's notes of interviews, particularly of his interview with Sgt Golf, was error.

---

[70] *United States v. Kohlbek*, 78 M.J. 326, 334 (C.A.A.F. 2019) (internal quotations and citations omitted).

[71] *United States v. Roberts*, 59 M.J. 323, 325 (C.A.A.F. 2004).

[72] *United States v. Coleman*, 72 M.J. 184, 187 (C.A.A.F. 2013) (cleaned up) (internal quotations and citations omitted).

[73] *Id.*

We will assume, without deciding, that Appellant's request for "all case notes, case agent summaries, interview notes and summaries"[74] was a specific request for undisclosed information, and therefore will test to determine if the Government's failure to disclose material evidence was harmless beyond a reasonable doubt.

We are convinced that the failure of disclosure was harmless beyond a reasonable doubt because, in spite of the Government's misfeasance, GySgt Hotel's testimony was wholly ineffective. The Defense was able to show that GySgt Hotel's investigation was incomplete, myopic, and in some cases factually inaccurate. Additional cross-examination would have yielded nothing further.

GySgt Hotel's testimony regarding his efforts to locate Mr. Echo was only relevant to the alleged domestic violence of Ms. R.L. His testimony regarding Appellant's ownership and the operation of a SIG Sauer P320 was aimed at showing that when Appellant pointed a firearm at Ms. C.T. the firearm was loaded. Appellant was acquitted of all of these specifications.

Appellant's convictions for false official statements had nothing to do with either Mr. Echo or Appellant's ownership of a firearm. The members received overwhelming evidence that Appellant had lied to Captain Mike when questioned regarding his relationship with Ms. R.L.

Additionally, we fail to see how evidence that Appellant owned more than one firearm or that GySgt Hotel's investigation was inadequate would have had any bearing on the members' findings that Appellant had assaulted Ms. C.T. with an unloaded firearm. Three people testified that Appellant pointed a firearm at Ms. C.T. as discussed above. Appellant's primary defense against this specification was that Appellant perceived a threat from Ms. C.T. and was authorized to threaten her with a firearm to defend himself. He also argued, as here, that Ms. C.T. was not afraid when Appellant pointed the pistol at her. Finally, while Appellant generally denied using a firearm when questioned by Officer Alpha, this was contradicted, at least in part, by his acknowledgement that he had "overreact[ed]."[75]

Appellant's ownership of other weapons and GySgt Hotel's inadequate investigation would not have changed the outcome for this offense. Whether Appellant used a P320, a 1911, or any other handgun is of no moment. The fact

---

[74] Appellate Ex. LXXXIII at 27.

[75] R. at 760.

remains that the Government proved beyond a reasonable doubt, through witnesses wholly independent of GySgt Hotel, that Appellant pointed a handgun at Ms. C.T.

## D. Appellant's trial defense counsel's failure to interview GySgt Hotel did not prejudice Appellant.

### 1. Law

We review claims of ineffective assistance of counsel de novo.[76] To prevail on such a claim, "an appellant must demonstrate both (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice."[77] The appellant bears the "burden of establishing the truth of factual matters relevant to the claim."[78] Only after an appellant has met his burden and has demonstrated both deficiency and prejudice can we find in the appellant's favor on an ineffective assistance of counsel claim.[79]

To establish deficiency, an appellant must first overcome "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[80] A military appellate court "will not second-guess the strategic or tactical decisions made at trial by defense counsel."[81] If an appellant raises the issue of ineffective assistance of counsel based upon a challenge against the trial strategy or tactics of the defense counsel, "the appellant must show specific defects in counsel's performance that were 'unreasonable under prevailing professional norms.'"[82]

"Because investigation is an essential component of the adversary process, that testing process generally will not function properly unless defense counsel

---

[76] *United States v. Mazza,* 67 M.J. 470, 474 (C.A.A.F. 2009) (citations omitted).

[77] *United States v. Green,* 68 M.J. 360, 361-62 (C.A.A.F. 2010) (citing *Strickland v. Washington,* 466 U.S. 668, 687 (1984)) (citation omitted).

[78] *Denedo v. United States,* 66 M.J. 114, 128 (C.A.A.F. 2008) (citation omitted).

[79] *Cooper,* 80 M.J. at 672.

[80] *United States v. Scott,* 81 M.J. 79, 84 (C.A.A.F. 2021) (quoting *Strickland,* 466 U.S. at 489).

[81] *United States v. Anderson,* 55 M.J. 198, 202 (C.A.A.F. 2001) (quoting *United States v. Morgan,* 37 M.J. 407, 410 (C.M.A. 1993)).

[82] *Mazza,* 67 M.J. at 475 (quoting *United States v. Perez,* 64 M.J. 239, 243 (C.A.A.F. 2006)).

has done some investigation."[83] Defense counsel, therefore, "must perform a reasonable investigation, or make a reasonable decision that an avenue of investigation is unnecessary."[84]

However, even if an appellant may be able to show that his counsel were deficient, "it is not necessary to decide the issue of deficient performance when it is apparent that the alleged deficiency has not caused prejudice."[85] "Attorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial."[86] In assessing for prejudice, the Supreme Court has held that we must determine if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."[87]

### 2. Analysis

Appellant insists that his counsel were constitutionally deficient because counsel failed to interview GySgt Hotel and therefore failed to uncover the Government's discovery errors, discussed above. Trial defense counsel admitted to the military judge during trial to having not interviewed GySgt Hotel, despite the fact that he was listed as a witness on the Government's pretrial matters and despite the fact that it appears that GySgt Hotel was willing to meet with trial defense counsel prior to trial to discuss his testimony. While the decision not to attempt to interview a Government witness may be a tactical one, it is one that is taken at counsel's peril.

However, as we previously discussed, the Defense was able to discredit GySgt Hotel's investigation and testimony even without having interviewed him. In the end, GySgt Hotel's testimony related only to offenses of which Appellant was acquitted. We are therefore able to conclude relatively easily that there is no reasonable probability that Appellant's trial would have had a different outcome even had trial defense counsel conducted an adequate interview of GySgt Hotel pretrial. GySgt Hotel's testimony simply did not relate to the

---

[83] *United States v. Scott,* 24 M.J. 186, 188 (C.M.A. 1987) (cleaned up) (citation omitted).

[84] *United States v. Brownfield*, 52 M.J. 40, 42 (C.A.A.F. 1999) (citation omitted).

[85] *United States v. Bradley*, 71 M.J. 13, 16 (C.A.A.F. 2012) (citation omitted). *See also, Strickland,* 466 U.S. at 697. ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice...that course should be followed.").

[86] *Scott*, 24 M.J. at 189.

[87] *Strickland*, 466 U.S. at 694.

false official statement Specifications, and his testimony regarding the assault of Ms. C.T. was aimed entirely at proving that the pistol Appellant used was loaded—which the members rejected in acquitting Appellant of aggravated assault. We therefore conclude that even if Appellant's trial defense counsel were deficient, Appellant was not prejudiced by the deficiency.

### E. Sentence reassessment

Because we have determined that Appellant's conviction for extramarital sexual conduct is factually insufficient, we must now consider Appellant's sentence in accordance with Article 66, UCMJ. Courts of Criminal Appeals (CCAs) can often "modify sentences 'more expeditiously, more intelligently, and more fairly' than a new court-martial[.]"[88] In such cases, CCAs "act with broad discretion when reassessing sentences."[89] We consider the following "illustrative, but not dispositive, points of analysis...when determining whether to reassess a sentence or order a rehearing" in this case:

> (1) Whether there has been a dramatic change in the penalty landscape or exposure.
>
> (2) Whether sentencing was by members or a military judge alone.
>
> (3) Whether the nature of the remaining offenses captures the gravamen of criminal conduct included within the original offenses and whether significant or aggravating circumstances addressed at the court-martial remain admissible and relevant to the remaining offenses.
>
> (4) Whether the remaining offenses are of the type with which appellate judges should have the experience and familiarity to reliably determine what sentence would have been imposed at trial.[90]

Reassessing a sentence is appropriate only if we are able to reliably determine that, absent the error, the sentence would have been at least of a certain

---

[88] *United States v. Winckelmann*, 73 M.J. 11, 15 (C.A.A.F. 2013) (quoting *Jackson v. Taylor*, 353 U.S. 569, 580 (1957)).

[89] *Id.*

[90] *Id.* at 15-16.

magnitude.[91] A reassessed sentence must not only "be purged of prejudicial error [but] also must be 'appropriate' for the offense involved."[92]

Here we are convinced that we can reassess the sentence in light of the *Winckelmann* factors. We do so for the following reasons. First, we find that there has not been a dramatic change in the penalty landscape. At trial, the maximum punishment that Appellant faced was a dishonorable discharge, total forfeitures, reduction to enlisted paygrade of E-1, and confinement for nine years.[93] The maximum punishment for extramarital sexual conduct is a dishonorable discharge, total forfeitures, reduction to enlisted paygrade of E-1 and confinement for one year. Appellant's punitive exposure is thus reduced only to a dishonorable discharge, total forfeitures, reduction to enlisted paygrade of E-1 and 8 years' confinement.

Second, we find that the nature of the remaining offenses captures the gravamen of criminal conduct included within the original offenses. The Government's case was primarily focused on Appellant's alleged assaults of Ms. R.L. and Ms. C.T. The testimony and evidence regarding Charge III was limited both on the merits and in sentencing and was appropriately handled by the military judge who did not allow the members to receive evidence of Appellant's alleged abuse of Ms. C.A.

Finally, the remaining offenses are of the type with which we have the experience and familiarity to reliable determine what sentence would have been imposed at trial. Appellant, a non-commissioned officer in the Marine Corps, was convicted by the members of committing a brazen and unprovoked assault of a civilian on a public street with an unloaded handgun. The members heard testimony from three independent witnesses that Appellant was screaming obscenities at a complete stranger for a simple dispute regarding the placement of his girlfriend's car on a public road. He also lied, repeatedly, to a commissioned officer tasked with investigating the claims of his estranged spouse.

Having considered all of the evidence properly before the court-martial, we can confidently and reliably determine that, absent the conviction for extramarital sexual conduct, the members would have sentenced the appellant to at least confinement for 12 months, forfeiture of all pay and allowances, reduction

---

[91] *United States v. Harris*, 53 M.J. 86, 88 (C.A.A.F. 2000).

[92] *United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986).

[93] After findings, the military judge granted a defense motion to treat the two Specifications of False Official Statement as one for sentencing, reducing Appellant's maximum confinement exposure from 14 years to 9 years. R. at 1216-17.

to paygrade E-1, and a bad-conduct discharge. We also find that sentence to be an appropriate punishment for the modified convictions and this offender— thus satisfying the requirement for a reassessed sentence both purged of error and appropriate.[94]

## III. CONCLUSION

The findings of guilty to Charge III and its sole Specification are **SET ASIDE** and **DISMISSED WITH PREJUDICE**. After careful consideration of the record as a whole and the briefs and arguments of the parties, we have determined that the remaining findings and sentence as approved on appeal are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights remains.[95] Accordingly, the remaining findings and sentence as reassessed by this Court are **AFFIRMED.**



FOR THE COURT:

MARK K. JAMISON
Clerk of Court

---

[94] *Sales*, 22 M.J. at 308.

[95] Articles 59 & 66, UCMJ.